UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| WILLIAM SHEPARD; | ) | |
| WALTER B. POSNER; | ) | |
| CHRISTOPHER T. MICHAELS; | ) | |
| MICHAEL MILLER; | ) | |
| THE FLORENCE POSNER | ) | |
| REVOCABLE TRUST DATED | ) | Case No. 11-cv-7601 |
| 07/27/2001, a trust; JOSEPH MORETTI; | ) | |
| and ELISA H. POSNER, | ) | Judge John W. Darrah |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| MILES LUSTIG; GRANT LUSTIG; | ) | |
| LUSTIG CAPITAL, LLC, an Illinois | ) | |
| limited liability company; | ) | |
| ME LAYZ, LLC, and Illinois limited | ) | |
| liability company; | ) | |
| L&N PARTNERSHIP, an Illinois | ) | |
| partnership; CLIENT FUNDING | ) | |
| SOLUTIONS CORPORATION, an | ) | |
| Illinois corporation; and | ) | |
| W&M TRADING CORPORATION, an | ) | |
| Illinois corporation, | ) | |
| | | |
| Defendants. | | |

**MEMORANDUM OPINION AND ORDER**

Certain Defendants[1] - Miles Lustig ("Miles"), Grant Lustig ("Grant"), and Lustig

Capital, LLC - move to dismiss Count III of the Amended Complaint filed by Plaintiffs,

pursuant to Federal Rule of Civil Procedure 12(b)(6), for failure to state a claim upon

which relief may be granted.  For the reasons presented below, Defendants' Motion to

---

[1] Plaintiffs' Amended Complaint names Joe Cacciatore, Jr. as a defendant in the caption of the Complaint.  However, Joe Cacciatore, Jr. was dismissed as a defendant with prejudice on January 17, 2012.  While Cacciatore is not a party to the dispute, he is referred in multiple instances in the Amended Complaint.

Dismiss is granted.

## BACKGROUND

Defendants removed the instant action from the Circuit Court of Cook County,

Illinois, on October 25, 2011. The initial complaint, filed by Plaintiffs in Cook County

on August 17, 2011, alleged three separate counts: (I) a violation of the Illinois Business

Corporation Act, 805 ILCS 5/12.56; (II) a common-law claim of breach of fiduciary

duty; and (III) a civil violation of the Racketeer Influenced and Corrupt Organizations

Act ("RICO"), 18 U.S.C. §§ 1861, *et seq.* With leave of the Court, Plaintiffs filed an

amended complaint on August 15, 2012.[2] Defendants move to dismiss Count III of the

Amended Complaint, the RICO claim, arguing Plaintiffs failed to properly plead the

RICO claim with particularity and failed to properly plead a pattern of racketeering

activity or the existence of an enterprise, as required by 18 U.S.C. § 1861.

Plaintiffs allege the following facts in support of their claims, which must be

accepted as true for purposes of this Motion to Dismiss. *See AnchorBank, FSB v. Hofer*,

649 F.3d 610, 614 (7th Cir. 2011) (*AnchorBank*). Plaintiffs include six Illinois individual

residents and a trust, also located in Illinois. (Am. Compl. ¶¶ 1-7.) Defendant Miles

Lustig is also an Illinois resident and the father of Defendant Grant Lustig. (*Id.* ¶ 8.)

Miles and Grant are members and managers of Defendant Lustig Capital, LLC. (*Id.* ¶¶ 8-

9.) Miles is also an officer of Defendants Clients Funding Solutions Corporation and

---

[2] Defendants contend in their Reply Brief that Plaintiffs' original RICO claim "was dismissed by this Court in response to Defendants' original Motion to Dismiss said claim." (Reply Br. at 1.) However, no opinion was issued by this Court regarding the previous Motion to Dismiss, which was withdrawn without prejudice and with leave to refile after Plaintiffs were granted leave to file an Amended Complaint pursuant to Fed. R. Civ. P. 15(a)(2).

W&M Trading Corporation, while Grant is a member of Defendant ME LAYZ, LLC.

(*Id.*)

In September 2006, Miles and Grant formed Workforce Financial, Inc.

("Workforce Financial").  (*Id.* ¶ 16.)  Grant was the president of Workforce Financial

until his resignation in July 2011.  (*Id.*)  Miles was previously employed as a trader at the

Chicago Mercantile Exchange for many years.  (*Id.* ¶ 17.)  Miles and Grant solicited

investments for Workforce Financial and, from March 2009 through December 2010,

raised over $1.3 million in capital from investors (none of whom are parties to this suit).

(*Id.* ¶¶ 18-19.)

In late 2009 and early 2010, Miles and Grant approached Plaintiffs with an

investment opportunity, representing to Plaintiffs that by investing money with Miles and

Grant, they would receive a significant return on their investments.  (*Id.* ¶¶ 20-21,

67(e)(i).)  Grant and Miles met with Plaintiff Walter Posner in December 2009, outside

the Chicago Board of Trade, to discuss making a capital investment in a new project.  (*Id.*

¶ 67(e)(i).)  Grant and Miles also contacted many other potential investors, including the

other Plaintiffs, to obtain the necessary start-up capital to form Workforce Financial.  (*Id.*

¶ 67(e)(ii).)  Grant indicated to the investors, including Plaintiffs, that he would operate

Workforce Financial on a full-time basis with Miles' regular oversight.  (*Id.*)  From

February to April of 2010, Defendants held additional meetings with prospective

investors, including several at Morton's Steakhouse restaurant in Northbrook, Illinois.

(*Id.* ¶ 67(e)(iii).)  At these meetings, Grant and Miles explained that the Workforce

Financial business model consisted of issuing low denominational, unsecured consumer

loans and that the industry of these unsecured loans was government-regulated and a rapidly growing field. (*Id.*) At these investor meetings, Grant and Miles provided Plaintiffs with a 3-year plan of Workforce Financial's business model, including sample loans, a schedule of operating expenses, and a sample statement of loan durations and sizes. (*Id.*) This financial information for Workforce Financial was also sent through the mail to Plaintiff Posner in April 2010; Miles represented to Posner that March 2010 had been the company's best month yet. (*Id.* ¶ 67(e)(iv).) In March and April of 2010, Grant and Miles conducted meetings with the potential investors, including Plaintiffs, at Morton's Steakhouse; Attorney Robert Gerber also appeared at these meetings and to assure the investors that an investment in Workforce Financial was a prudent one. (*Id.* ¶¶ 67(e)(v)-(vi).) At the meeting at Morton's in April 2010, Plaintiffs agreed to invest money with Grant and Miles. (*Id.*)

On June 4, 2010, Miles and Grant established Workforce Investors, LLC ("Workforce LLC"), a limited liability company into which Plaintiffs' investments would be placed. (*Id.* ¶ 22.) Grant is the manager of Workforce LLC. (*Id.*) Plaintiffs invested $3 million in Workforce LLC during 2010; these investments were made by delivering checks, payable to Workforce LLC, to Miles or Grant. (*Id.* ¶¶ 23-24.) The purpose of Workforce LLC, according to the Operating Agreement, was to make revolving credit loans to Workforce Financial, pursuant to a Credit Agreement signed by each Plaintiff and Grant, in his capacity as Workforce LLC's manager and Workforce Financial's president. (*Id.* ¶¶ 26-27.) Plaintiffs were to receive shares of stock in Workforce Financial in exchange for investment in Workforce LLC. (*Id.* ¶ 28.) Plaintiffs were to

receive interest on their investments at a rate of ten percent annually; these interest payments were to be made monthly. (*Id.* ¶ 33.) However, Plaintiffs have never received any interest payments, or any other return on their investments with Workforce Financial or Workforce LLC. (*Id.* ¶ 36.) Instead, Plaintiffs' investments were used by Grant and Miles for their own personal purposes, including cash withdrawals, investing in bars and restaurants, purchasing a currency exchange, purchasing a condominium in Florida, and furnishing funds to other entities operated by Miles and Grant. (*Id.* ¶ 35.) Grant and Miles conspired and formed a scheme to defraud Plaintiffs, by convincing Plaintiffs to invest in Workforce LLC and Workforce Financial, when Grant and Miles knew they would not pay Plaintiffs interest nor return their principal investments. (*Id.* ¶ 67(a).) Grant and Miles used wires and the mail to execute their scheme of defrauding Plaintiffs. (*Id.* ¶ 68.) On several occasions, funds were wired from Workforce Financial to Lustig Capital; however, these transactions were recorded in Workforce Financial's books as transfers, lowering the amount Workforce Financial owed to other individuals. (*Id.* ¶¶ 68(a)-(k).) In one instance, a check was issued from Workforce Financial in the amount of $27,369.28 for the purchase of 2011 Chicago Cubs season tickets. (*Id.* ¶ 68(n).)

Grant was involved in an automobile accident on July 31, 2010; he then sought to cover up the accident and made misrepresentations relating to the accident to an insurance company. (*Id.* ¶ 75.) Victor Brown, then a Chicago Police Officer, informed Grant he possessed information regarding the automobile accident; in exchange for a loan, Brown agreed to help Grant avoid criminal charges. (*Id.* ¶ 76.) Grant provided Brown a $2,000.00 loan, using Workforce funds. (*Id.* ¶ 77.) After this bribery took

place, Brown was indicted and convicted on the bribery scheme; Grant had been subpoenaed to testify before a Grand Jury for Brown's case. (*Id.* ¶ 83.) An attorney accompanied Grant to this proceeding and was paid $3,600.00 from Workforce funds. (*Id.*) On November 28, 2012, Grant was sentenced to a term of three years probation for his perjury before that Grand Jury. (*United States v. Lustig*, Case No. 12-cr-314, Dkt. No. 25, Judgment entered November 28, 2012.)

Miles and Grant sought to have Plaintiffs sign "releases" of their loans to Workforce Financial in August 2011; these releases would shift Workforce Financial's obligations to Plaintiffs to other entities controlled by Miles and Grant. (Am. Compl. ¶ 38.) That same month, Plaintiffs filed their initial complaint against Defendants in Cook County, Illinois.

## LEGAL STANDARD

To properly assert a claim in a complaint, the plaintiff must present "a short and plain statement of the claim showing that the pleader is entitled to relief and a demand for the relief sought." Fed. R. Civ. P. 8. Rule 8 "does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (*Iqbal*) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (*Twombly*)). While a court is to accept all allegations contained in a complaint as true, this principle does not extend to legal conclusions. *Iqbal*, 129 S. Ct. at 1949.

A defendant may file a motion to dismiss a claim under Federal Rule 12(b)(6) for failure to state a claim upon which relief may be granted. To defeat a motion to dismiss

under Rule 12(b)(6), a plaintiff must plead sufficient factual matter to state a claim for relief that is "plausible on its face." *Iqbal*, 129 S. Ct. at 1949 (citing *Twombly*, 550 U.S. at 570). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 129 S. Ct. at 1949.

However, "[w]here the well-settled pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'show[n]' – 'that the pleader is entitled to relief.'" *Iqbal*, 129 S. Ct. at 1950. For a claim to be plausible, the plaintiff must put forth enough "facts to raise a reasonable expectation that discovery will reveal evidence" supporting the plaintiff's allegations. *Brooks v. Ross,* 578 F.3d 574, 581 (2009) (quoting *Twombly*, 550 U.S. at 556). At issue in a 12(b)(6) motion is "not whether a plaintiff will ultimately prevail" but whether the plaintiff is entitled to present evidence to support the claims alleged. *AnchorBank*, 649 F.3d at 614 (internal quotation and citation omitted).

Federal Rule of Civil Procedure 9(b) governs the pleading of fraud, and the rule imposes a more stringent pleading standard than Rule 8. Rule 9 provides that, "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, or other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). To meet this heightened pleading standard, "a plaintiff ordinarily must describe the 'who, what, when, where, and how' of the fraud – 'the first paragraph of any newspaper story.'" *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v. Walgreen Co.*, 631 F.3d 436, 441-42 (7th Cir. 2011)

(*Pirelli*) (quoting *United States ex rel. Lusby v. Rolls–Royce Corp.*, 570 F.3d 849, 854

(7th Cir. 2009)).  The exact level of particularity necessary varies based on the facts of a

case.  *Id.*

## ANALYSIS

Count III of Plaintiffs' Complaint alleges a RICO violation on the part of

Defendants.  The RICO Act provides:

> It shall be unlawful for any person employed by or associated with any
> enterprise engaged in, or the activities of which affect, interstate or foreign
> commerce, to conduct or participate, directly or indirectly, in the conduct
> of such enterprise's affairs through a pattern of racketeering activity or
> collection of unlawful debt.

18 U.S.C. § 1962(c).  RICO addresses "a unique cause of action that is concerned

with eradicating organized, long-term, habitual criminal activity."  *Gamboa v.*

*Velez*, 457 F.3d 703, 705 (7th Cir. 2006).  The *prima facie* elements of a RICO

claim are:  (1) conduct (2) of an enterprise (3) through a pattern (4) of

racketeering activity.  *Id.*

Defendants present three separate attacks on the RICO claim in Plaintiffs'

Amended Complaint.  First, Defendants argue Plaintiffs failed to plead the fraud

of the RICO claim with the particularity required under Fed. R. Civ. P. 9.

Second, Defendants contend Plaintiffs failed to allege a pattern of racketeering

activity, as defined by 18 U.S.C. § 1961(5).  Finally, Defendants assert Plaintiffs

failed to plead the existence of an "enterprise," as defined by the RICO Act.

*Pleading with Particularity*

Defendants argue Count III of the Amended Complaint fails to meet the requirements of Fed. R. Civ. P. 9(b), which requires specificity in alleging claims of fraud.

To satisfy the pleading with particularity requirement, "a RICO plaintiff must allege the identity of the person who made the representation, the time, place and content of the misrepresentation, and the method by which the misrepresentation was communicated to the plaintiff." *Slaney v. The International Amateur Athletic Federation*, 244 F.3d 580, 599 (7th Cir. 2001). Defendants contend Plaintiffs failed to "establish to whom the alleged misrepresentation [sic] were made, or when or where they were made." (Mem. in Support of Mot. to Dismiss at 5.) To the contrary, however, Plaintiffs alleged in the Amended Complaint that misrepresentations were made to the investors of Workforce Financial, including Plaintiffs, at meetings, during phone calls, and in the Credit Agreement. (Am. Compl. ¶ 67.) Grant and Miles represented to Plaintiffs that investors would receive interest on their investments in the amount of ten percent annually; Defendants further stated that "Grant would not be authorized to expense restaurant, entertainment, or other unnecessary charges on Workforce Financial's account." (*Id.* ¶ 67(e)(ii).) In April, 2010, Plaintiff Walter Posner also received, through the mail, financial information sheets regarding the Workforce Financial operational plan from Miles. (*Id.* ¶ 67(e)(iv).) Despite relating to Plaintiffs and other potential investors the purpose and expected financial returns of the Workforce Financial plan, Plaintiffs allege they have never received any return on their investment

9

and that their investment funds have, instead, been diverted to other unauthorized expenditures and fraudulent activity. Plaintiffs specifically allege Defendants used the mail and wires to perpetrate the frauds, by mailing information regarding the financial plan of the business, and by wiring investor money to other parties, which was not in accordance with the Workforce Financial plan. These allegations in the Amended Complaint are sufficient to meet the pleading standard under Fed. R. Civ. P. 9(b). Plaintiffs have provided the who, what, when, where, why, and how necessary in their Amended Complaint to plead fraud under Fed. R. Civ. P. 9(b). *See Pirelli*, 631 F.3d at 441-42.

Defendants further submit that the Amended Complaint is too conclusory in the allegations of Miles' and Grant's states of mind; Plaintiffs fail to "indicate or infer intent on the part of Miles and Grant to fraudulently induce Plaintiffs." (Mem. in Support of Mot. to Dismiss at 6.) Defendants' point ignores the language of Fed. R. Civ. P. 9(b), which specifically provides "[m]alice, intent, knowledge, or other conditions of a person's mind may be alleged *generally*." Fed. R. Civ. P. 9(b) (emphasis added). Plaintiffs adequately plead intent in the Amended Complaint, asserting that "Miles and Grant promised to pay Plaintiffs, as investors, interest in the amount of ten percent per annum (10%) on Plaintiffs' investments, with the intent to induce Plaintiffs to make the Investments with Workforce LLC and Workforce Inc." (Am. Compl. ¶ 67(d).) Plaintiffs further alleged: "Miles and Grant knew and understood that their purpose and the method of achieving that purpose were fraudulent and unlawful and would result in injury to Plaintiffs, yet agreed and understood that each would act in concert with the

other to achieve this purpose, and did so with the specific intent to deceive and defraud

Plaintiffs." (*Id.* ¶ 67(g).) Plaintiffs have sufficiently pled the intent of Miles and Grant at

the pleading stage of the proceeding. *See Triad Assoc., Inc. v. Robinson*, 10 F.3d 492,

497 (7th Cir. 1993) (noting "in this circuit on a motion to dismiss we require no more

from plaintiffs' allegations of intent than what would satisfy Rule 8's notice pleading

minimum and Rule 9(b)'s requirement that motive and intent be pleaded generally.").

  Finally, in arguing that the Amended Complaint fails to allege fraud with

particularity, Defendants assert that Miles' and Grant's alleged actions are entitled to a

presumption of a reasonableness under the Business Judgment Rule, which "creates a

presumption that a business decision . . . was made in good faith and with due care."

*CDX Liquidating Trust v. Venrock Associates*, 640 F.3d 209, 215 (7th Cir. 2011). "[A]t

the motion to dismiss phase, it stands to reason that the burden of proof is on the party

challenging a corporate decision made by a director to present allegations that rebut the

presumption created by the business judgment rule." *F.D.I.C., ex. rel. Wheatland Bank v.*

*Spangler*, 836 F. Supp. 2d 778, 792 (N.D. Ill. 2011). However, the presumption of the

Business Judgment Rule may be rebutted with allegations that a director acted

fraudulently. *Id.* Plaintiffs' RICO claim is premised on allegations that Grant and Miles

fraudulently induced Plaintiffs into investing in Workforce Financial for a return on their

investments and used Plaintiffs' investments for their own personal gains and interests,

instead. Plaintiffs sufficiently allege Defendants' actions were fraudulent and, therefore,

not entitled to the presumption of good faith created by the Business Judgment Rule. *Id.*

(declining to excuse defendants' behavior by the Business Judgment Rule when

11

reviewing facts alleged by plaintiffs).

*Pleading a Pattern of Racketeering Activity*

Defendants further argue Count III of Plaintiffs' Amended Complaint should be

dismissed because Plaintiffs failed to allege a "pattern of racketeering activity," as

required by the RICO Act. RICO defines a "pattern of racketeering" as a pattern which

"requires at least two acts of racketeering activity, one of which occurred after the

effective date of this chapter [October 15, 1970] and the last of which occurred within ten

years . . . after the commission of a prior act of racketeering activity." 18 U.S.C.

§ 1961(5). A pattern is established by at least two racketeering acts within ten years. To

satisfy this element of a RICO claim, "the alleged acts of wrongdoing must not only be

related, but . . . must amount to or pose a threat of continued criminal activity." *Gamboa*

*v. Velez*, 457 F.3d 703, 705 (7th Cir. 2006) (*Gamboa*). In considering a pattern of

racketeering activity, a court applies the "continuity plus relationship" test to determine if

a plaintiff has alleged continued criminal activity and a relationship between the various

criminal acts. *Roger Whitmore's Auto. Services, Inc. v. Lake County, Illinois*, 424 F.3d

659, 672 (7th Cir. 2005) (*Roger Whitmore*).

A pattern of racketeering activity may be established as a "close-ended" scheme,

"a completed scheme that, by its duration, can carry an implicit threat of future harm";

or, an "open-ended" scheme, "a scheme that, by its intrinsic (e.g., business-as-usual)

nature, threatens repetition and thus future harm." *Gamboa*, 457 F.3d at 706.

Close-Ended Continuity

"A party alleging a RICO violation may demonstrate continuity over a closed

12

period by proving a series of related predicates extending over a substantial period of time." *H.J. Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229, 242 (1989). When the acts extend over only a few weeks or months, and the threat of future criminal conduct is not imminent, the plaintiff fails to establish a close-ended continuity. *Id.* Defendants argue the predicate acts of mail and wire fraud alleged by Plaintiffs did not extend over a "substantial period of time." (Mem. in Support of Mot. to Dismiss at 8.)

The Seventh Circuit has acknowledged "that no single formula is required for a RICO pattern: there may be one scheme or many schemes; there may be only a few acts of racketeering or there may be many." *J.D. Marshall Intern., Inc. v. Redstart, Inc.*, 935 F.2d 815, 821 (7th Cir. 1991) (further providing that "the existence of a genuine threat of continued criminal activity" is required). There is not, as a rule, a specific length of time a scheme must last to establish continuity in the Seventh Circuit. *See Roger Whitmore*, 424 F.3d at 673. Here, Plaintiffs allege the first predicate act, soliciting a plaintiff as investor, occurred in December 2009, when Grant and Miles met with Walter Posner. (Am. Compl. ¶ 67(e)(i).) Plaintiffs also state "from October 2010 until and including November 2011, in furtherance of their scheme to deceive and defraud Plaintiffs, Miles and Grant utilized the wires and/or the mail . . . for the purpose of executing the aforesaid scheme." (*Id.* ¶ 68.) But nowhere in the Amended Complaint do Plaintiffs allege a specific predicate act committed in November of 2011. Considering the Amended Complaint in a light most favorable to Plaintiffs, the most recent predicate acts clearly alleged in the Amended Complaint are: (1) in or around August 2011, Miles and Grant sought to have the initial investors sign "releases" of their Workforce Financial loans,

13

which would have shifted Workforce Financial's obligations from Plaintiffs to other

entities controlled by Miles and Grant; and (2) on or about August 15, 2011, Grant sold

the Florida condo purchased with Plaintiffs' investment funds in Workforce Financial,

though none of the sale proceeds were returned to Workforce Financial or its investors.

(*Id.* ¶¶ 38, 115(c).)[3]  Under these facts, that would establish a timeframe for the scheme

of twenty months, from December 2009 through August 2011.  Defendants argue the

alleged scheme "spanned at most only 13 months," while Plaintiffs assert the time

elapsed between the first and last predicate acts is two and a half years.  (Mem. in

Support of Mot. to Dismiss at 8; Plaintiffs' Resp. at 10.)

Both Plaintiffs and Defendants place emphasis on the duration of the scheme,

which, while important to the analysis, is not dispositive.  Other factors in determining

the existence of a pattern include "the number and variety of predicate acts[,] . . . the

number of victims, the presence of separate schemes and the occurrence of distinct

injuries."  *Vicom, Inc. v. Harbridge Merchant Servs., Inc.*, 20 F.3d 771, 782 (7th Cir.

1994) (*Vicom*) (citation omitted).  These factors are considered "with an eye toward

achieving a natural and commonsense result, recognizing that Congress was concerned in

RICO with long-term criminal conduct."  *Id.* (internal quotation marks omitted).  In this

---

[3] In the Amended Complaint, Plaintiffs also allege facts relating to a state law bribery involving Grant and Chicago Police Officer Victor Brown.  (Am. Compl. ¶¶ 72-83.)  While the Amended Complaint states that the bribery occurred February 22, 2010, this date is incorrect.  Grant pled guilty to a charge of perjury relating to his testimony before a Grand Jury about the bribery on July 12, 2012.  (Resp. Ex. A.)  In the transcript of Grant's change of plea hearing, it is made clear that the bribery occurred in February 2011.  (Resp. Ex. A, Tr. 16:15 – 16:20.)  Regardless of the date of the bribery, Plaintiffs fail to demonstrate how the bribery and related perjury would be characterized as racketeering activities on the part of the enterprise.  Therefore, these events are not considered in the analysis for purposes of determining the existence of a RICO claim.

case, only seven victims are identified: the seven named Plaintiffs. *See Roger Whitmore*, 424 F.3d at 673 (stating "the victims of the defendants' activities were confined to a small group - the dozen or so approved towers from 1997 to 1999 - which does not help [plaintiff]'s case for continuity."). A single fraudulent scheme was identified: Defendants obtained investment funds from Plaintiffs and then used the funds for several different purposes, none of which included the stated goal of the investment plan, to return interest to Plaintiffs. While each Plaintiff suffered a separate injury, these injuries could not fairly be characterized as distinct; each Plaintiff was induced to invest money with Workforce Financial by Grant and Miles and sustained the injuries of not receiving interest, as promised, and losing their investments in Workforce Financial. (Am. Compl. ¶ 120.) It is also unclear from the Amended Complaint what, if any, threat of future harm exists.

Considering all of the factors discussed above, Plaintiffs have failed to allege a closed-ended scheme to establish a pattern of racketeering activity necessary to state a RICO claim.

Open-Ended Continuity

An open-ended continuity exists when "(1) a specific threat of repetition exists, (2) the predicates are a regular way of conducting [an] ongoing legitimate business, or (3) the predicates can be attributed to a defendant operating as part of a long-term association that exists for criminal purposes." *Vicom*, 20 F.3d at 782 (internal quotations omitted).

Plaintiffs are unable to allege that an open-ended continuity exists in Defendants'

15

scheme.   Miles and Grant are not presently members of Workforce Financial's Board of

Directors.  (*See* Am. Compl. ¶ 59, "Although Workforce [Financial] is no longer

controlled by Miles and Grant, the Enterprise is still active.")  However, Plaintiffs note

that Defendants may re-assert their previously filed motion for injunctive relief to have

Grant and Miles resume control of Workforce Financial.  (Plaintiffs' Resp. at 11-12.)

This vague assertion does not rise to the level of a specific threat of repetition; and,

moreover, it is unclear what activities *could* be repeated, unless Plaintiffs decide, after

the experiences they have alleged, to invest more money with Grant and Miles.  Plaintiffs

have alleged that initial investments in Workforce Financial "are gone."  (Am. Compl. ¶

120(c).)  *See Vicom*, 20 F.3d at 782-84 (citing *Olive Can Co. v. Martin*, 906 F.2d 1147

(7th Cir. 1990) and ruling that a specific threat of repetition does not exist where the

scheme has a natural ending point).  Therefore, no continuing threat can be alleged by

Plaintiffs, particularly when Grant and Miles are, at the present time, not in control of

Workforce Financial, and because, as Plaintiffs state, their investments are already lost.

"[S]chemes which have a clear and terminable goal have a natural ending point . . . .

[and] cannot support a finding of any specific threat of continuity that would constitute

open-ended continuity."  *Vicom*, 20 F.3d at 782.

As Plaintiffs are unable to establish a pattern of racketeering activity, either open-

ended or closed-ended, as required by 18 U.S.C. § 1961(5) and the relevant case law,

they fail to allege a *prima facie* RICO claim, and their RICO claim must be dismissed.

*Existence of an Enterprise*

Moreover, even if Plaintiffs were able to establish a pattern of racketeering

16

activity, Plaintiffs fail to establish the existence of an enterprise. Plaintiffs allege in the

Amended Complaint that Workforce Financial and Workforce LLC are an "enterprise"

under the RICO Act. (Am. Compl. ¶ 57.) Notably, Plaintiffs allege that "[t]he *goal of*

*the Lustigs* was to attract unwitting investors to invest funds with the seemingly

legitimate business front of the Enterprise, and to divert those funds through other

organizations or entities owned and controlled by them." (*Id.* ¶ 58.) (emphasis added).

Plaintiffs describe the goal of the individuals, Grant and Miles, rather than explaining the

goal of the purported enterprise. However, RICO liability "depends on showing that the

defendants conducted or participated in the conduct of the "*enterprise's* affairs," not just

their *own* affairs." *Reves v. Ernst & Young*, 507 U.S. 170, 185 (1993) (emphasis in

original). "A RICO enterprise is more than a combination of persons who commit

alleged predicate acts of racketeering; there must be an organization with a structure and

goals separate from the predicate acts themselves." *Crichton v. Golden Rule Ins. Co.*,

576 F.3d 392, 400 (7th Cir. 2009).

Here, Plaintiffs present no allegations that the predicate acts described were the

acts of the "enterprise," rather than the acts of the individuals. *See Richmond v.*

*Nationwide Cassel L.P.*, 52 F.3d 640, 646-47 (7th Cir. 1995) (affirming the dismissal of a

RICO claim and holding "when an entity is an individual who conducts his own affairs

through a pattern of racketeering, there is no enterprise and hence no valid § 1962(c)

RICO claim."). Plaintiffs do not allege the establishment of an enterprise with its own

set of goals and ongoing activities. Rather, they describe a sort of piggy bank for Grant

and Miles to dip into in order to make various purchases for their own personal benefit

and for the benefit of other entities within their control.  Because Plaintiffs do not establish an overarching goal of the enterprise, some purpose separate from a fund serving the needs and wants of Grant and Miles Lustig, they cannot establish the existence of an enterprise within the meaning of the RICO Act.

Hence, even if Plaintiffs could establish a pattern of racketeering activity, their RICO claim must be dismissed because Plaintiffs have not established the existence of an enterprise necessary to support a RICO claim.

## CONCLUSION

For the reasons set forth above, the Motion to Dismiss Count III of Plaintiffs' Amended Complaint, filed by Defendants Grant Lustig, Miles Lustig, and Lustig Capital, LLC is granted, and Plaintiffs' RICO claim is dismissed with prejudice.

Date:  December 13, 2012

JOHN W. DARRAH
United States District Court Judge